[No. 13930.  Department One.  September 18, 1917.]

H. A. BIER, *Appellant*, v. JAMES B. CLEMENTS *et al.*, *County Commissioners of Benton County, Respondents.*[1]

COUNTIES—COUNTY COMMISSIONERS—POWERS—ISSUANCE OF BONDS—DISCRETION—BAD FAITH — INJUNCTION.  The issuance of county bonds for the construction of a courthouse and their sale will be enjoined as arbitrary, fraudulent and in bad faith, where it was all secretly arranged and put through at a meeting of the board by two of its members in collusion with bond buyers, without any publicity or opportunity for competitive bidding and at a higher rate of interest than the market conditions justified, no action having been taken to plan or build a courthouse or procure a site.

Appeal from a judgment of the superior court for Benton county, Grady, J., entered December 29, 1916, dismissing an action for an injunction, after a trial on the merits to the court.  Reversed.

*M. F. Gose, Moulton & Jeffrey, W. V. Tanner* and *Scott Z. Henderson*, for appellant.

*C. W. Fristoe, E. A. Davis*, and *Zent & Powell*, for respondents.

*Donworth & Todd* and *R. E. Campbell*, amicus curiae.

MORRIS, J.—Appellant, who is a taxpayer of Benton county, commenced this action below, seeking to enjoin re-

[1]Reported in 167 Pac. 903.

spondents, as county officers, from issuing or negotiating certain county bonds in the amount of $125,000 for the purpose of erecting a courthouse. The facts, so far as they pertain to the determinative feature upon which we rest our conclusion, are these: Prior to November 11, 1916, the board of commissioners of Benton county consisted of James B. Clements, A. G. McNeil and F. L. Bash. On that day the board met in regular session for the transaction of such business as might properly come before it. The business of the day being apparently concluded, but before any formal adjournment, commissioner Bash departed for his home, thereupon the other two commissioners, no one else being present, adopted the following resolution:

"It appearing to the board that the lease on the courthouse will expire on the 31st day of December, 1916, it is ordered that commissioners Clements and McNeil be authorized to go to Spokane and see what terms can be obtained upon a renewal of the present lease of the courthouse. If no lease can be obtained, to investigate and find out what other quarters can be secured."

Pursuant to the resolution, commissioners Clements and McNeil, on November 20th or 21st, went to Pasco and consulted with E. A. Davis, an attorney of that city, who, at their request, accompanied the commissioners to Spokane for a conference with Messrs. Zent and Powell upon the legal phase of the scheme then in contemplation. The result of the Spokane conference was a determination to issue county bonds and, out of the proceeds, erect a courthouse. Up to this time no action had been taken by the board of county commissioners relative to the construction of a courthouse, nor had any discussion taken place at any of their meetings suggesting the issuance of county bonds in any form for that purpose; no plans had been adopted looking to the erection of a courthouse; in fact, so far as the board of commissioners was concerned, the idea of erecting a courthouse was yet unborn.

It was further determined at the Spokane meeting that the success of the scheme then contemplated depended upon its being kept secret from all persons other than the moving parties and such financial agents and bond buyers as they might take into their confidence; the necessity of secrecy arising, according to the testimony of the participants in the Spokane conference, in order to avoid litigation and attempts to frustrate the issuance of the bonds upon the part of those residents of the county who were thought to be opposed to the erection of a courthouse at Prosser, the contention being that such attempts would interfere with the salability of the bonds and materially affect their value. The two commissioners returned to their homes, leaving the matter of arranging the details of the bond issue and the procurement of a buyer with their attorneys. The next meeting of the board of commissioners of Benton county was to take place on December 4th. Between the adjournment of the Spokane conference and December 4th, all parties interested were successful in maintaining the desired secrecy. There was no leak. Outside of Clements and McNeil, so far as the record advises us, no one in Benton county knew what had transpired nor what was contemplated, the two commissioners not even taking Bash into their confidence nor giving him any inkling of present or coming events as related to the contemplated bond issue.

On Sunday, December 3d, Mr. Zent, of counsel employed by Clements and McNeil, appeared at Prosser with the bonds issued in serial number from 1 to 250, inclusive, aggregating $125,000. The bonds were dated December 4th, and contained an·unsigned certificate of registration. On December 3, Mr. Zent and commissioner Clements, the chairman of the board, appeared at the home of county treasurer Harper, and there commissioner Clements signed the bonds as chairman of the board, and the county treasurer, at the request of Clements, attached his signature to the certificate of registration. On the same day, the county auditor was re-

quested to attest the bonds and was informed that the bonds had been sold and that the board at its meeting the next day would pass a resolution authorizing the issue and another resolution confirming the sale to the purchaser, who was then upon the ground all ready to complete his part of the transaction. On Monday morning the board of commissioners met and a resolution, previously prepared, was introduced authorizing the issuance of the bonds in the form and manner already determined upon. This resolution was adopted upon the vote of commissioners Clements and McNeil, commissioner Bash, who testified that this was the first intimation of the whole matter coming to his knowledge, voting in the negative. Commissioner McNeil then presented two letters and one telegram in which offers were made to take the bonds at par with interest at 5½ per cent per annum. A fourth bidder, Geo. B. Keeler, appeared in person and submitted a written bid offering the same amount as the other bidders, accompanied by a sight draft on his firm of $5,000. Commissioner McNeil moved that the last bid be accepted, and Mr. Keeler then presented a formal resolution evidently, like the bonds and prior resolution, prepared in advance, setting forth the adoption of the prior resolution to issue the bonds, the receipt and canvass of bids, a finding that the bid of Keeler Brothers was the highest and best bid, and formally accepting the same. This resolution was adopted by commissioners Clements and McNeil. During this time objections were made to all the procedure on the part of appellant and others, who had been advised by the county auditor on Sunday of what was sought to be accomplished.

At the trial, witnesses on behalf of appellant, representing reputable bond buyers and the state board of finance, testified that, based upon market conditions and actual sales of like municipal securities at the time, these bonds, if advertised and offered for sale on the open market, would have brought par at 4¼ or 4½, and if sold at 5½ would have brought a premium of at least eleven points. Respondents

offered proof to the effect that the sale was made at a fair price, but the evidence of the witnesses so testifying is not reliable, not being based upon knowledge of market conditions for like securities, but being advanced largely as an opinion based upon the supposition that the price of the bonds would be affected by litigation, a supposition which is not borne out by the record, except as it may have been intimated to the four bidders interviewed by the attorneys for respondents and who, with strange unanimity, bid exactly the same price, permitting one of them to attend in person and accompany his bid with a sight draft on his own firm of $5,000. There was no reason why Benton county securities should bring a less price than like securities of other municipalities. The county was in excellent financial condition. It had at the time a valuation in excess of $12,000,000, and was on a cash basis with no indebtedness.

The motive actuating commissioners Clements and McNeil to take the action they did, while not very material or relevant, is plainly shown. The term of office of both would have expired the following January; each had been a candidate at the preceding election and each had been defeated. The record is not silent to the effect that these defeats were not graciously accepted; that the defeated candidates intended to do something before leaving office that would reflect their opinion of the political sagacity of those persons in the county who had opposed them.

It does not seem necessary to dwell longer upon the facts before us. Sometimes a statement of the facts announces the law—this is such a case. A board of county commissioners is a legislative and deliberative body, and as such, acting within its scope and discretion, its action is final. In the exercise of its discretion such a board must, however, act in good faith and without fraud in law or in fact to those whom it serves. This much the law demands, and when county commissioners go beyond the limits of good faith and palpably abuse the discretion vested in them, the law will inter-

fere for the protection of the taxpayer. This record is reeking with bad faith. There was no good nor justifiable reason for commissioners Clements and McNeil pursuing the course they did, nor for their failure to apprise commissioner Bash of the action contemplated. The prosecuting attorney is, by law, the legal adviser of the board. In this case he is passed over and outside legal advice is sought. The record is silent as to the reason, but, in the light of other facts, it may be surmised. By jugglery and secretive procedure a bond issue is to be foisted upon the taxpayers of Benton county without the previous knowledge of any save the first active participants; a courthouse is to be built without prior determination of plans, estimate of cost, procurement of site, or deliberation or discussion of the matter on the part of the board, or indulgence in any of those matters that usually precede an undertaking of this character. The issuance of these bonds and their attempted sale was not the result of the deliberate discretion of the board of commissioners for Benton county, it was nothing more than the individual acts of commissioners Clements and McNeil, deliberately concealed and kept secret from all those who were entitled to knowledge of the contemplated action or who might be supposed to take an active interest in public matters. The board of commissioners of Benton county, as such, never acted upon, nor had knowledge of, what was to be done until the final consummation of the scheme on December 4th. The procedure is sought to be justified by showing that Benton county was occupying an old, dilapidated and unfit courthouse, and that there was an actual necessity for the erection of a new building. The need of a new courthouse may be admitted, but that fact does not justify the methods employed to obtain one.

No citation of authorities is necessary to sustain the conclusion we have reached that the action of these two commissioners was so arbitrary, fraudulent, and in such bad faith as to merit the censure of the law and grant appellant the relief prayed for. Our reasoning is sustained in the following of

our own cases: *Krieschel v. Board of Com'rs, Snohomish County,* 12 Wash. 428, 41 Pac. 186; *Times Publishing Co. v. Everett,* 9 Wash. 518, 37 Pac. 695, 43 Am. St. 865; *State ex rel. Yeargin v. Maschke,* 90 Wash. 249, 155 Pac. 1064.

Two other interesting legal questions are presented by the record; one is as to the political status of commissioner McNeil on December 4th. He had been appointed to fill a vacancy and his successor had been elected at the previous November election. There is a question as to whether or not the successor had qualified on December 2d. In view of the conclusion reached upon the greater question of good faith, we have not gone into this matter. It is probable McNeil was an officer *de facto,* if not *de jure* on December 4th, at least, we prefer to treat him as such. The other question is. as to whether the board was legally in session on December 4th. In view of our general conclusion, this question need not be passed upon.

The judgment is reversed; case remanded with instructions to grant relief prayed for.

Ellis, C. J., Mount, Main, and Chadwick, JJ., concur.